**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Keith Allen and Dawn Allen, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Unison Agreement Corporation, Unison Investment Management, LLC, Real Estate Equity Exchange, Inc., Odin New Horizon Real Estate Fund, LP, Odin New Horizon General Partner, LLC, and Rexington Holdings, Inc.<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. For many Minnesotans, owning a home is a cornerstone of economic mobility, financial stability, and personal security. Home equity is often a person's largest asset. Over time, many homeowners will access the equity in their home to assist with other financial obligations, such as supplementing retirement, education, home improvements, or long-term care costs for themselves or a loved one. For others, their home is a primary source of generational wealth that will be passed on to their children and family members.

2. Today, the home equity market is valued at approximately $35 trillion dollars and is the largest asset class in the United States. The equity built over time traditionally belongs to the homeowner—the person working hard to make the monthly mortgage payments, and who often relies on that equity as a financial backstop.

3. But in recent years institutional and high-net-worth investors have been seeking a piece of that pie for themselves in ways that are increasingly unfair or deceptive to homeowners.

4. Enter Unison.[1] Unison was founded in the early 2000s to give investors access to the home equity market, without those investors actually having to own or sell the homes themselves to profit. To do this, Unison created a new lending product, known as a home equity sharing agreement, which provides homeowners with an upfront payment of cash in exchange for a percentage stake in the home's future value. In effect, Unison's product allows homeowners to tap into a portion of their equity now by promising an even larger amount of their equity to Unison in the future.

5. To entice homeowners to use Unison, the company markets itself as a "simple" "loan alternative" option that creates "no debt" and has "no interest" or monthly payments.

---

[1] All named Defendants are referred to collectively as Unison or the Unison Defendants.

6. The problem is that Unison's product *is* a mortgage loan. Its product does create debt, and the homeowner will almost certainly be required to repay every penny they receive, plus interest in the form of a significant lump sum ballon payment at the conclusion of the term.

7. The final payment is often multiple times more than the homeowner was initially advanced. It is often so exorbitant that homeowners must sell their home in order to pay it, with many walking away from the sale with little to show for the equity they worked hard to amass over time.

8. Unison deceptively claims that its product is an "option contract" and not a mortgage loan and therefore, is not required to comply with the strict federal or state lending laws that govern mortgage products. The federal lending laws that Unison disregards include licensing and disclosure requirements that would require it to be honest about the nature and cost of its transactions. Further, Minnesota's consumer protection and mortgage licensing and lending laws prohibit Unison from the many unfair, deceptive, and misleading practices it engages in to obscure the truth about the nature and cost of its product. Minnesota forbids predatory mortgage lending that puts Minnesotans' equity and housing stability at risk. Minnesota additionally requires licensure of lenders and strict compliance with statutory interest rates for loans less than $100,000.

9. Unfortunately, at the time homeowners execute a Unison

agreement, they are not aware of the consequences. This is through no fault of their own—in fact, Unison's product is designed to prevent the consumer from understanding the full scope of the agreement prior to entering into the loan. The Unison transaction is reflected in a web of interlocking agreements spanning multiple documents, which contain confusing cross references and approximately a dozen different formulas for calculating repayment. Only a notary attends the closing, so there is no Unison representative to answer any questions the homeowner may have when signing. Not even experienced mortgage bankers understand the nature of Unison's product.

10. By the time homeowners discover the truth of the Unison product they are already locked into the agreement, and their home is encumbered by a deed of trust. At this point, the only way out is to find a significant amount of cash, often in the six figures, to buy out Unison, or sell their home. Homeowners who have spent years working hard, saving, and building equity are left holding the bag, while Unison and its investors reap annualized profits of over 20%.

11. For Unison, business is booming. It has agreements with over 17,000 homeowners nationwide, in properties cumulatively valued at $8.1 billion dollars, including with homeowners within Minnesota.

12. Keith and Dawn Allen (the "Allens") are two Minnesotans currently ensnared in a Unison Agreement. Because Unison products wreak

significant havoc on the economic well-being of Minnesota homeowners, Plaintiffs, on behalf of themselves and others similarly situated, bring this action to enforce Minnesota consumer protection laws against Unison for its ongoing unfair and deceptive practices in Minnesota that harm Minnesota residents. Plaintiffs bring this action on behalf of themselves and all other similarly situated Minnesota residents who have entered into Unison Agreements relating to property located in Minnesota. Plaintiffs seek to hold Unison liable for its violations of Minnesota's mortgage, lending, and consumer protection laws.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy, exclusive of interest and costs, exceeds the sum of $5,000,000 and is a class action in which members of the Class are citizens of a state different than each of the Defendants.

14. This Court has personal jurisdiction over Defendants because Defendants have transacted business in this District, and unlawful conduct alleged in this Complaint occurred in, was directed to, or emanated from this District.

15. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' and Class members' claims occurred in this District.

16. Venue is further proper in this District based on the local action doctrine. *See Bigio v. Coca-Cola Co.,* 239 F.3d 440, 449-50 (2d Cir. 2000); *Eldee-K Rental Props., LLC v. DIRECTV, Inc.*, 748 F.3d 943, 948 (9th Cir. 2014) (observing that "a majority of federal courts have concluded that the local action doctrine is a rule of subject matter jurisdiction"); *Kingsborough v. Sprint Commc'ns Co., L.P.*, 673 F. Supp. 2d 24, 30-35 (D. Mass. 2009) (holding that resolution of title and land ownership issues was local).

**PARTIES**

17. Keith and Dawn Allen are citizens of Minnesota and reside in Roseville, Minnesota, located in Ramsey County.

18. Defendant Unison Agreement Corporation (UAC):

a. is a Delaware corporation with a principal place of business at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111;

b. is not licensed or registered as a mortgage lender, mortgage loan originator, or mortgage broker with the Department of Insurance, Securities, and Banking;

c. originated the transactions at issue in this Complaint; and

d. is a wholly owned subsidiary of Real Estate Equity Exchange, Inc. (REX).

19. Defendant Unison Investment Management, LLC (UIM):

a. is a Delaware corporation and SEC-registered investment advisor with a principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, CA 94111;

b. UIM provides investment advisory services to pooled investment vehicles (Funds). The Funds invest primarily in Unison homeowner agreements, originated by Unison Agreement Corp. or securities issued by issuers or securitizations of Unison Agreements;

c. UIM together with its affiliates serve as general partners and investment managers of the Funds. Such affiliates are typically under common control and/or possess substantial identity of personnel and/or equity owners with UIM;

d. as of December 31, 2024, UIM had regulatory assets under management of approximately $1,685,557,326; and is a wholly owned subsidiary of REX;

e. is one of the corporate parents of Odin New Horizon Real Estate Fund, LP (ONH) and Odin New Horizon General Partners, LLC (OGP).

20. Defendant Odin New Horizon Real Estate Fund LP:

a. is a Delaware limited partnership with a principal place of business 4 Embarcadero Center, Suite 710, San Francisco,

CA 94111;

b. UIM, REX, Rexington Holdings, Inc, and OGP are ONH's sole members;

c. UIM is the fund manager and, even per ONH's assignment notice, all communications and notices are to be directed to UIM.

21. Odin New Horizon General Partner, LLC:

a. is a Delaware limited liability company with its principal place of business located at 4 Embarcadero Center, Suite 710, San Francisco, CA 94111;

b. is one of the corporate parents of ONH;

c. UIM and REX are the sole members of OGP.

22. Defendant Real Estate Equity Exchange, Inc.:

a. is a Delaware corporation with a principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, CA 94111;

b. is the corporate parent of UAC, UIM; according to information it provides to consumers, does business under the names "Unison," "Unison Agreement Corp.," and "Unison Investment Management LLC," and establishes and maintains the websites and many materials for UAC and

UIM;

c. and is not licensed or registered as a mortgage lender, mortgage loan originator, or mortgage broker with the Department of Insurance, Securities, and Banking.

23. Rexington Holdings, Inc. (RHI):

a. is a Delaware corporation with a principal place of business located at 4 Embarcadero Center, Suite 710, San Francisco, CA 94111.

b. RHI operates as corporate parent entity alongside REX and is one of the corporate parents of ONH.

24. Upon information and belief, at all relevant times, there has existed a unity of interest and ownership between UAC, UIM, ONH, OGP, RHI, and REX (referred to collectively herein as Defendants or Unison). There is no individuality or separateness between Defendants and their affiliates, and they are the mere instrumentalities, agents, conduits, or adjuncts of one another. As an example of this unity of interest, UIM's Form ADV Part 2A notes that its affiliates (which includes UAC and REX) are "typically under common control and/or possess substantial identity of personnel and/or equity owners."

25. Defendants have combined their property, skill, and knowledge for the purpose of carrying out a single business enterprise, namely the origination

of and realizing financial gains from the Unison products described herein.

26. Together, Defendants are a vertically integrated home equity mortgage origination, securitization, and investment advising firm focused on the asset class of owner-occupied residential real estate joined in a common enterprise. As an example, the same persons dominate, control, and manage Defendants, namely Thomas Sponholtz (CEO of all three entities), Scott Case (CFO of all three entities), and Matthew O'Hara (CIO of UAC and UIM), among others.

27. Upon information and belief, Defendants use the same offices and employees, including offices located at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111.

28. Defendants were, and are, the alter egos of one another and adherence to the fiction of the separate existence of Defendants would permit an abuse of the corporate privilege, sanction fraud and/or promote injustice, and result in inequitable consequences, such that any liability incurred by one Defendant is chargeable against the other.

29. Because of their agreement and cooperation in the wrongful acts set forth herein, Defendants are responsible for the acts of one another.

30. Unison operates in thirty-three states, including Minnesota.

## FACTS

### A. The Process and Structure of the Unison Agreements

31. The Unison transaction is complex and confusing. Homeowners like Plaintiffs who enter into a Unison HomeBuyer Agreement all go through a similar process and execute the same form documents.

32. The transaction begins with the Offer Letter. If the homeowner wishes to proceed within the 180 day offer period, the next step is the Conditional Approval Package, which contains an offer letter, a summary of financial terms and fees, the conditions of approval, an updated estimate of fees, an asset administration fee schedule, and a notice containing important information, including a Total Unison Cost Estimate (TUCE) and a notice to interested parties who are not signatures to the agreement.

33. Notably the Conditional Approval Package does *not* include copies of the full agreements to which the homeowner will ultimately be bound but instead directs them to contact a Unison representative for the documents. The Conditional Approval Package and Offer Letter do not emphasize the language informing homeowners that they may request copies of the agreements, but the packages *do* emphasize the offer's expiration date.

34. Homeowners are required to pay Unison a transaction fee and other third-party fees at the time they sign the Conditional Approval Package.

35. The Unison HomeBuyer Agreement involves four primary

documents with interlocking and cross-cutting terms and obligations: the HomeBuyer Option Agreement, HomeBuyer Covenant Agreement, the Unison Memorandum of HomeBuyer Agreement, and the Unison Mortgage and Security Agreement. These four documents are referred to collectively herein as the "Agreement."[2]

36. Most homeowners see these documents for the first time at Unison's closing meeting, which is typically short in duration and attended only by a non-Unison notary, who cannot answer questions about the Unison HomeOwner Agreement's terms. These documents span hundreds of pages and contain cross-references, dozens of definitions (many of which also contain cross-references), and several complex mathematical formulas for repayment.

37. Under the Agreement, the homeowner receives an initial upfront payment of money, called a "Unison Down Payment" in the HomeBuyer Agreement and a "Unison Investment Payment" in the HomeOwner Agreement. This payment is determined, in part, based on an appraisal ordered and controlled by Unison, but paid for by the homeowner. Unison then applies a discount to the appraised amount to determine the Unison

---

[2] The four documents are attached hereto as **Exhibits A – D** respectively, along with other documents that accompany the transaction. The HomeOwner Product is comprised of the same four primary documents, but the term "HomeOwner" rather than "HomeBuyer" appears in the titles. Otherwise, the documents and material terms are substantially identical.

Investment Payment.

38. In return for this payment, the homeowner grants Unison a percentage share in the future value of the home, called the "Investor Percentage." The Agreement term is set for thirty years, although according to Sponholtz, homeowners typically exit the agreement much earlier, after just ten years.

39. As an example, the Allens' Unison Down Payment was 10% of the Original Agreed Value of their home, whereas the "Investor Percentage" she will pay Unison at the conclusion of the Agreement is 35%.

40. In Minnesota, after the Agreement is signed, Unison records a security interest titled "Unison HomeBuyer Mortgage" to secure its interest in the property and the obligations of the homeowner.

41. During the term of the Agreement, the homeowner pays all costs for the home, such as insurance and property taxes, and the costs of maintenance and repair. The homeowner must maintain the home to Unison's standard during the Agreement. Additionally, in nearly all cases, the home must remain owner occupied, and the homeowner is unable to rent the property to a third-party according to the terms of Unison's agreement.

42. If the homeowner falls behind on insurance or property taxes, Unison can obtain forced place insurance and make "Protective Advances" to cover missed payments. Protective Advances accrue interest at 1.5% per

month.

43. At the conclusion of the Agreement, the homeowner must pay Unison an amount called the "Investor Interest," which is determined by a formula that considers the "Ending Value" of the home (as defined by Unison) and the Investor Percentage identified at the start of the Agreement, as well as any other unpaid obligations of the homeowner, such as any Protective Advances made by Unison.

44. The homeowner must repay Unison in a single lump sum. No prepayments or partial payments are permitted. As such, many Unison customers are unable to pay the company without first selling their home. If the homeowner initiates a sale to repay Unison, the homeowner must pay all costs associated with the sale, including closing costs and appraisal costs, which could be in the thousands of dollars.

45. By manipulating property appraisals, avoiding responsibility of the costs of maintenance and repairs, and requiring homeowners to bear all risks and fees, Unison seeks to maximize the portion of a homeowner's equity that it can claim as its own. In other words, its entire business model is to find ways to benefit by claiming a right to the equity that homeowners have built up over time.

### B. Unison is Developed to Provide Investors Access to the Multitrillion Dollar Home Equity Market.

46. According to Unison's 2024 Home Equity Report, the American home equity market has "reached new heights." As of June 2024, the market totaled $35 trillion.[3] Older adults often have the highest level of home equity—valued at $14 trillion—because they have owned their homes the longest.[4]

47. Across the country, including in Minnesota, homeownership remains one of the most reliable ways to build wealth, primarily through the gradual accumulation of home equity. In Minnesota, between 2020 and 2025, the average home equity has grown by 53% and the average home equity is $135,554.[5]

48. Home equity plays a critical role in homeowners' financial security. Many homeowners access their home equity to supplement their retirement or pay off debts. Others use home equity to pay for significant expenses such as home improvements, education, healthcare costs, or long-term care. Products that allow homeowners to access their equity for these reasons are

---

[3] Jian Tong *Chua* & Winfield Xu, *2024 Unison Home Equity Report* 1 (Nov. 2024), https://contentimages.o-prod.unison.com/pdf/2024%20Home%20Equity%20Report.pdf (last visited on Sept. 28, 2026).

[4] *Senior Home Equity Stands at $13.95 Trillion, NRMLA* (Mar. 31, 2025), https://www.nrmlaonline.org/about/press-releases/senior-home-equity-stands-at-13-95-trillion (last visited on Sept. 28, 2026).

[5] *How home equity has changed in every U.S. state since 2020*, CNBC MAKE IT (Aug. 15, 2025), https://www.cnbc.com/2025/08/15/home-equity-changes-for-all-50-states-in-the-last-5-years.html (last accessed on Sept. 28, 2026).

commonplace and include home equity lines of credit (HELOC), home equity loans (sometimes referred to as a second mortgage), cash-out refinances, and reverse mortgages.

49. In the early 2000s, Thomas Sponholtz (Sponholtz), the founder and Chief Executive Officer of Unison, got the "big idea" for Unison's home equity product.[6] The idea came to him while working at Barclays Global Investors and "looking around for large asset classes [he] could add to [his] client's portfolio."[7] Sponholtz noticed that the residential real estate market was largely untapped by institutional investors, despite it being the "largest asset class, both globally and in the U.S." [8]

50. The absence of institutional investors in the market was driven by the burdens associated with the traditional way of investing in and profiting from residential real estate, which requires purchasing a home and renting it or reselling it. Sponholtz recognized that this method of investment is often inefficient and comes with "tremendous amount of administrative cost in maintaining and being a property manager of [] homes."[9]

51. With his clients and investors in mind, Sponholtz created Unison.

---

[6] Lend Academy, *Podcast 103: Thomas Sponholtz and Jim Riccitelli of Unison*, (June 7, 2017) https://www.heyfuturenexus.com/podcast-103-thomas-sponholtz-jim-riccitelli-unison/ (last visited on Sept. 28, 2026). (Podcast 103).
[7] *Id.*
[8] *Id.*
[9] *Podcast 103*, *supra* note 5.

Unison gives investors access to the residential real estate asset class—that is, to the equity that individual homeowners have accrued over time—through Unison's "equity sharing" products. In essence, these products are designed to allow Unison to claim a portion of homeowners' equity without taking on any of the concomitant costs, labor, burdens, or obligations of homeownership or real estate management.

52. At Unison's inception, it offered two products, one for homeowners and one for homebuyers, referred to as the HomeOwner Product and the HomeBuyer Product, respectively.[10] According to Spohnholtz, the products "work the same way so if you understand one, you'll understand both."[11]

53. The products work by Unison providing homeowners an upfront cash payment (either at time of purchase or during ownership) in exchange for a significant share of the homeowners' home equity (oftentimes 70%).

54. The homeowner retains all responsibility for the costs, labor, and burdens of homeownership, while Unison and its investors reap the rewards of increased equity without purchasing or maintaining the home themselves.

55. Further, Unison deploys a variety of mechanisms throughout the transaction to all but guarantee against the risk of any loss for the company,

---

[10] Throughout this Complaint the term "homeowner" is used to describe the individuals who are in Unison contracts, regardless of whether they entered into the HomeBuyer or HomeOwner product.

[11] *Podcast 103*, *supra* note 5.

including lowering the starting values of homes on the front end and then inflating the values on the back end to maximize the equity Unison can extract from the homeowner at the conclusion of the transaction.

56. Unison was launched in 2005. As of today, Unison's website boasts that the "total value of homes [it has] invested in across the country" is $9.2 billion.[12] Unison has agreements with over 17,000 homeowners and a wide geographical presence, operating in 33 states + Washington, D.C., including 250 metro areas[13] Together, Unison notes, those markets make up more than 81% of U.S. real estate by value.[14]

57. It is no coincidence that Unison operates in markets that represent the vast majority of the country's real estate value. Unison has a "10-year forecast on every house in America"[15] and uses its "proprietary investment decision engine" to carefully select the markets in which it will operate. The investment decision engine "capture[s] and integrate[s] the most recent market and industry research about real estate, demographic trends, and key

---

[12] *Homepage,* Unison IM, https://www.unisonim.com/,(last visited on Sept. 28, 2026).

[13] *Frequently Asked Questions: Eligibility: In which state are Equity Sharing Agreements available?* UNISON, https://www.unison.com/faqs/question/esa-available-states, (last visited on Sept. 28, 2026); *See also*, *Homepage,* Unison IM, https://www.unisonim.com/,(last visited on Sept. 28, 2026) (claiming that Unison has 33 states invested in its portfolio).

[14] *Id.*

[15] *Podcast 103*, *supra* note 5.

economic indicators such as employment and population growth. With this information, Unison seeks to invest in Unison Agreements on properties that it believes have a greater likelihood of appreciation."[16]

58. Unison's investment decision engine has paid off, at least for Unison and its investors. Notably, Unison describes "institutional investors" and "high net worth individuals" as "typical[]" investors.[17] Over the ten-year period from 2012 -2022, Unison had a net annualized return of 20.7% for its investors.

59. As recently as May 11, 2026 Unison promoted its product to investors as "unlimited upside and limited downside"[18] highlighting that "residential real estate has historically generated strong returns," and that its portfolios provide "low volatility and high risk-adjusted net returns."[19]

60. In recent years, Unison has begun securitizing its product. To date, it completed seven securitizations totaling over a billion dollars of its agreements in at least three different funds managed by Unison IM, further

---

[16] Unison Investment Management, LLC, Firm Brochure 8 (Form ADV Part 2A) (June 23, 2025) https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd iapd Brochure.aspx?BRCHR VRSN ID=982540

[17] *Id.*

[18] *Wayback Machine: Unison IM: About*, WAYBACK MACHINE , https://web.archive.org/web/20260511145435/https://www.unisonim.com/about-us, webpage last saved May 11, 2026 (last visited on Sept. 28, 2026 ).

[19] *Id.*

filling the coffers of Unison investors.[20]

61. Thus, Unison's business model is designed to benefit its high net worth individual and corporate investors, not the homeowners it purports to help.

### C. Unison Evades Regulatory Supervision Required of Lenders, Mortgage Originators, and Reverse-Mortgage Companies.

62. Unison's Home Equity Products are home loans. While Unison claims its product is an "option" contract and not a loan, this is inaccurate and misleading. According to Unison, the product is an "option" contract because the homeowner only has to pay if Unison decides, upon a triggering event, to exercise its "option" to acquire its interest in the value of the home. The triggering events are discussed more fully in Section D.

63. Unison attempts to label its product as something other than a loan so that it does not have to abide by required mortgage lending and licensing laws. But regardless of the label Unison affixes to its product, it *is* a mortgage loan. Under the Agreement, Unison provides homeowners with a cash advance in exchange for up to (and oftentimes) **70% share** of the homeowner's home equity.

64. The Agreement is designed so that homeowners almost always will

---

[20] *Newsroom*, UNISON, https://www.unison.com/press (last accessed Sept. 28, 2026).

repay the initial advance, plus much more, at the end of the term, despite Unison's representations that the Agreements are interest free and do not create debt. Unison secures its interest in repayment by placing a lien or mortgage on homeowner's properties, using deeds of trust or mortgages. depending on state law requirements.

65. These are all hallmarks of a mortgage loan. The Unison Investment Payment made to the homeowner at the outset is equivalent to the mortgage loan principal, the Security Instrument/Mortgage placed on the home is equivalent to the lien a mortgage lender places on the mortgaged property to secure its interests, and the Investor Interest due to Unison at the conclusion of the Agreement is aptly named, because it is the equivalent to interest on the principal of a mortgage loan.

66. While it is *possible*, even if not *probable*, that Unison could lose money on any given Agreement, that possibility does not insulate the product from being a loan. The risk of loss is a long-understood feature of both traditional and reverse mortgage products. The lender always bears a risk of loss, as demonstrated by the 2008 housing crisis. The risk of loss is particularly present for non-recourse mortgages, like Unison's, where the lender can only recover the amount of collateral securing the mortgage, *i.e.*, the value of the home.

67. While the risk of loss does not define whether the product is a loan,

it is worth noting that for Unison, loss seems unlikely. It carefully selects favorable markets in which to offer its product, touts to its investors that the Agreements have "unlimited upside" and only "limited downside," and markets its portfolio's 20.7% annualized returns over a ten-year period.

68. Additionally, Unison structures the deal to decrease the risk of loss, including by discounting the Original Agreed Value of the home, requiring the homeowner to shoulder all initiation, termination, and maintenance costs, and exercising control over how the Ending Agreed Value of the home is determined. All of these actions ensure that Unison maximizes the dollar amount of home value to which it is entitled and minimizes the impacts of any potential depreciation.

69. To further minimize the risk of loss, Unison bundles the Agreements and places them into an asset-backed security, exactly how other mortgage lenders securitize mortgage loans to reduce risks to the lender.

70. Unison claims that because it can choose not to exercise its "option," there is no repayment obligation, thus no loan. But its "exercise right" is nothing more than another loss mitigation mechanism. It strains credulity to imagine Unison would not exercise the "option" in a scenario where doing so would result in a profit to Unison.

71. Indeed, the Unison Agreement includes additional provision to guarantee Unison receives payment (plus fees) even in adverse scenarios.

72. For example, if a homeowner sells her home during the first 36 months of the contract, she will have to pay Unison what amounts to a pre-payment penalty, requiring payment of *the greater* of: (a) her initial advance (plus fees); or (b) the amount Unison would receive from the sale.

73. After three years, if a homeowner wants to remove the Unison mortgage on her home without leaving her home, she will have to pay Unison *the greater* of: (a) the Unison Down Payment or Investment Payment plus additional fees; or (b) the amount Unison would receive if she sold her home.

74. If a homeowner defaults on *any* of her obligations under the Agreement, Unison can foreclose and force the sale of the home and is expressly guaranteed repayment of its advance at a minimum.

75. Moreover, numerous statements made by Unison, including on its website, indicate that the payment obligation is absolute and not necessarily tied to an exercise event. In its Frequently Asked Question Section, one question reads: "How does an equity sharing agreement end? The response is: "When you sell, reach the end of the 30 year term, or end the agreement early, we'll establish an Ending Agreement Value (typically, the sale price). At settlement, you'll return the Initial Payment, plus (or minus) Unison's Investor Percentage on the difference between the Original Agreed Value and the Ending Agreed Value." Previously, Unison's website included a question titled "What happens at the end of the agreement?" The response was: "You can use

the funds provided by Unison for up to 30 years. After 30 years, you will need to either sell your home or buy us out."[21]

76. The length of the Agreement further ensures repayment. As Unison says, "home equity tends to increase with the years of homeownership."[22] The term of the Agreement is thirty years, and Unison reports that the Agreements remain in place for ten years on average. Over the course of this "longer term holding period[]," Unison itself states, "real estate tends to perform fairly consistently." Indeed, the Unison Agreements explicitly set forth that the homeowner must intend to live in the home for more than three years or otherwise can be considered in breach.

77. Additionally, the Unison HomeBuyer Mortgage that Unison records on properties in Minnesota contains a liquidated damages clause states that liquidated damages "means an amount equal to the sum of: (a) the Investor Proceeds, as calculated according to Article 10 ("Calculations") of the Unison HomeBuyer Covenant Agreement; (b) if the Owner failed to make one more monetary payments, the sum of all monetary obligations (including

---

[21] *How does an equity sharing agreement end?* UNISON, https://www.unison.com/faqs/question/esa-agreement-end, (last visited on Sept. 28, 2026); *Unison FAQS: Equity Sharing Agreements:What happens at the end of the agreement?*, WAYBACK MACHINE, https://web.archive.org/web/20260502155346/https://www.unison.com/faqs/equity-sharing-agreement, (last visited on Sept. 28, 2026).
[22] *2022 Unison Home Equity Report*, Unison (2022), https://perma.cc/2EWT-6Q4H/.

without limitation, all Unpaid Owner Obligations) owed to Investor by Owner under the Unison HomeBuyer Agreement; and, (c) any and all amounts, properly chargeable to Owner needed to satisfy Owner's obligations under the Unison HomeBuyer Agreement with respect to Owner's mortgage, tax, and insurance obligations on the Property, including late fees, reinstatement fees and other penalties."

78. In the Allens' Agreement, the security instrument used to secure Unison's interest is a Mortgage and the Assignment of Unison HomeBuyer Agreement refers to the homeowners as the "Mortgagor" and Unison as the "Mortgagee".

79. Documents from at least one title company engaged by Unison for a transaction involving a Minnesota homeowner refer to the homeowner as the "borrower" and Unison as the "lender" during the closing process and refer to the Unison Down Payment as "2nd Mortgage Funds".

80. Unison's HomeBuyer Mortgage also purports to constitute a security agreement and fulfills the requirements of a UCC-1 Financing Statement under Minnesota's Uniform Commercial Code, which is a document required to memorialize the terms of a secured debt and that must expressly identify a debtor and secured party.[23]

---

[23] **Exhibit D**, Unison HomeBuyer Mortgage at 4 § 3.

81. On information and belief, similar statements appear in other title documents used by Unison in Minnesota.

82. Similarly, Unison admits that the lien it places on consumers' homes to secure its interest is "very similar to what a mortgage lender would use to secure its investment in your home."[24]

83. Unison was not a licensed mortgage lender in the State of Minnesota. On information and belief, Unison partnered with licensed mortgage lenders, brokers, or real estate agents within Minnesota to give homeowners the impression of licensure. In turn, these lenders, brokers, or agents were incentivized to provide homeowner referrals to Unison, indirectly or directly.

### D. Unison's Product is Unfair and Deceptive Because it Misleads Homeowners about the Actual Cost.

84. Unison's product may be alluring to a homeowner looking to access their equity. After all, homeowners are told by Unison that they can access cash to "live the life you really want" with "no added debt, no interest and no monthly payment." But, as discussed above, these statements are false. Unison's product *does* create debt and carries interest.

85. Additionally, noticeably missing from communications to

---

[24] *How does Unison secure its interest in the property?*, UNISON, https://www.unison.com/faqs/question/esa-lien, (last visited on Sept. 28, 2026).

homeowners is the *amount* the homeowner will be required to pay Unison.

86. Instead, Unison informs homeowners they are in a partnership "fair and square" and both Unison and the homeowner will "either both profit or … share in the loss."[25]

87. Nor does Unison make clear to homeowners up front the total costs associated with its product, including information on total fees and costs that will have to be paid at initiation, termination, and throughout the transaction.

88. Unison further misleads homeowners about the total cost of the transaction by representing that its product is "better than a traditional home equity line of credit," but not providing homeowners with proper comparison tools for other traditional equity products that may be better suited for the homeowner.[26]

89. Unison claims that because its product is not a mortgage loan, it is not required to disclose information about the total costs in the form and manner required by mortgage lending laws.

90. But, as alleged, Unison's product *is* a loan and those disclosures are required.

91. Even if the product were not a loan, however, the Agreement is

---

[25] Unison, *How it Works – Unison Equity Sharing – Homeowner*, YOUTUBE, at 0:42, 1:25-27 (June 30, 2023), https://www.youtube.com/watch?v=KG7ygY6_sWM, (last visited on Sept. 28, 2026).
[26] *Id.* at 0:39-40.

unfair and deceptive because it misleads and confuses homeowners as to the total cost and ultimate payment obligations due, including the amount of the final lump sum balloon payment.

92. These practices impart significant harm on Minnesota homeowners. At the conclusion of the Agreement, homeowners are at risk of losing what is likely their largest asset – their home.

93. This risk is not just theoretical, because the amount due at the end of the Agreement can be in the hundreds of thousands of dollars.[27] Many homeowners will be forced to sell their home to satisfy the payment or face foreclosure.[28]

**E. Unison's Product is Unfair and Deceptive Because the Homeowner Cannot Understand or Determine the Final Payment Amount Due Under the Agreement**

94. The Unison transaction is structured so as to confuse and mislead homeowners.

95. As discussed above, the details and obligations under the Agreement are spread across four primary documents: the HomeOwner Covenant Agreement, the HomeOwner Option Agreement, the Unison

[27] *Issue Spotlight: Home Equity Contracts: Market Overview*, CFPB OFFICE OF MORTGAGE MARKETS (Jan. 15, 2025), https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-home-equity-contracts-market-overview/, (last visited on Sept. 28, 2026).

[28] *Id.*

Memorandum of HomeOwner Agreement, and the Unison Deed of Trust and Security Agreement.

96. There are also several other documents that cover the transaction, including, but not limited to, the Unison Closing Statement, the Unison Homeowner Agreement Closing Instructions, a Deferred Maintenance Addendum, a Notice and Acknowledgment for Non-Signatories to the Agreement, and various title documents.

97. Together these documents can span approximately 100 pages, contain confusing cross-references, dozens of definitions (many of which also contain cross-references), and several complex formulas.

98. Examination of the various payment scenarios in the Agreement documents highlights how difficult, if not impossible, it is for a homeowner to understand how much they will owe Unison at the conclusion of the Agreement.

99. A homeowner's payment obligation becomes due upon several "Exercise Events." The Agreement outlines four such events, each of which requires the homeowner to pay Unison either directly or out of the proceeds of a sale of the home. The four Exercise Events are: (1) the sale or transfer of the property by the owner, (2) death of the last surviving owner, (3) expiration of the Agreement term, (4) a material and uncured event of default by the homeowner.

100. The amount due to Unison from the homeowner after an Exercise Event is called the Investor Interest.

101. The Agreement's explanation of how the Investor Interest is calculated is a prime example of how difficult it is for a homeowner to understand what the final payment obligation will be.

102. According to the Agreement, the "Investor Interest . . . shall be defined and calculated as the Investor Proceeds, if any, *plus* the Unpaid Owner Obligations, if any."[29] Investor Proceeds "shall be defined and calculated as follows: Ending Agreed Value *multiplied by* Investor Percentage *minus* the Unison Purchase Price Balance."[30]

103. To decode what this means, the homeowner must understand the definition of "Ending Agreed Value" which the Agreement explains is calculated as "**Base Ending Agreed Value** (as set forth in **Section 10.4** below) *minus any* Remodeling Adjustment* *plus any* Deferred Maintenance Adjustment."[31] The asterisk explains "If there is a Negative Remodeling Adjustment, the absolute value of that number is added rather than subtracted."[32] The terms "Remodeling Adjustment" and "Deferred

[29] **Exhibit B**, Covenant Agreement at ¶ 10.1(c) (emphasis in original).
[30] *Id.* at ¶ 10.1(a) (emphasis in original).
[31] *Id.* at 10.3, embedded in ¶ 10.2 (emphasis in original).
[32] **Exhibit B**, Covenant Agreement at 10.3, embedded in ¶ 10.2 (emphasis in original).

Maintenance Adjustment" are defined several pages later, in Schedule A, among more than 80 other definitions over 5 pages in smaller font than the rest of the document.

104. The homeowner must then move to Section 10.4 to understand the "Base Ending Value," which is a component of the Ending Agreed Value formula, and can be calculated *ten different ways*, as described in Sections 10.4(a) – 10.4(j). Each of these different calculations cross-references other defined terms and formulas, some of which make the ultimate calculation subject to Unison's discretion.

105. If the homeowner is able to determine the appropriate Base Ending Value calculation, they then must plug it into the Ending Agreed Value formula. Once they determine the Ending Agreed Value, they can then, finally, attempt to determine the Investor Interest, assuming all information needed for the formula is accurate and available (for example, if an appraisal value is needed for any of the formula inputs, but an appraisal has not yet been conducted, the homeowner cannot definitively determine the amount due).

106. Understandably, any homeowner embarking on this byzantine set of cross-references, definitions, and confusing formulas would have difficulty discerning the amount they must pay Unison at the conclusion of the Agreement.

107. Further obscuring the total amount the homeowner will owe is the

"Unison Purchase Price Balance" which is subtracted from the Investor Proceeds to determine the Investor Interest.

108. The Unison Purchase Price is the amount of the purported "second payment" Unison will pay the homeowner upon an Exercise Event. In reality, this "payment" is merely an offset of the profits Unison takes from the sale of the home (or an offset on the amount paid directly by the homeowner if no sale). The Unison Purchase Price Balance is never actually deposited into a homeowner's account.

109. But, because the Unison Purchase Price Balance amount is prominently displayed, and can reach into the six figures, it can mislead consumers, causing them to either misunderstand how much they will owe or causing them to believe they will receive a deposit of a significant sum of money at the conclusion of the Agreement.[33]

110. In addition to the "Exercise Events" there are other events that terminate the Agreement and guarantee Unison express repayment. These events similarly make it difficult for the homeowner to understand the total cost of the product.

111. First, if the homeowner sells or terminates the contract during the start of the agreement (a period that used to be three years long, and on

[33] *See, e.g.*, **Exhibit A**, Option Agreement at 4.

information and belief, now appears to be five years in more recent agreements), the homeowner must repay Unison. If the home has declined in value during this period, Unison *will not share* in any decline in value, and the Base Ending Agreed Value will be the Effective Sale Price or the Original Agreed Value, *whichever is greater*.[34]

112. To determine how much the homeowner will owe under this scenario they would need to understand the definition of Effective Sale Price and Original Agreed Value and then determine which would be greater. Both terms are defined in the long list of definitions found in Schedule A, attached to the Homeowner Covenant Agreement document.[35]

113. If the homeowner can accurately determine the Effective Sale Price and the Original Agreed Value, and then determine which is greater, they must then plug the greater number into the Ending Agreed Value formula. After determining the Ending Agreed Value, the homeowner can then insert that number into the Investor Proceeds formula in order to decipher the Investor Interest amount they must pay Unison.

114. A homeowner who wants to exit the Agreement after the three-to-five-year period, but before an Exercise Event, is also obligated to pay Unison.

---

[34] *What is the "restriction period"? Can I sell my home at any time?*, UNISON, https://www.unison.com/faqs/question/esa-restriction-period, (last visited on Sept. 28, 2026); *see also* **Exhibit B**, Covenant Agreement at ¶ 10.4(b).
[35] **Exhibit B**, Covenant Agreement, Schedule A at 36-40.

This is called a "Special Termination," and the amount due is "the greater of" (a) "the Unison Investment Payment plus any Unpaid Owner Obligations", or (b) "the Investor Interest."[36]

115. The Special Termination Event is explained to the homeowner in the Homeowner Option Agreement, but the homeowner must also reference the Homeowner Covenant Agreement for a full understanding of how it operates.[37] The Homeowner Covenant Agreement notes that the "[t]he Investor Proceeds in any Special Termination shall be calculated using an Ending Agreed Value equal to the greater of the Appraised Value of the Property at the time of the Special Termination, or the **Solicited Sale Value**."[38]

116. To discover what this means in terms of payment, homeowners would have to embark on the same journey as for other payment events. They would have to dive into the definitions in Schedule A to ascertain the definition of "Appraised Value" and "Solicited Sale Value" and then determine which is greater. After calculating these two numbers and determining the greater of the two, the homeowner must then plug the greater number into the Ending Agreed Value formula. Once they have that number, they can then move to the Investor Proceeds formulas to ultimately determine the Investor Interest

---

[36] **Exhibit B**, Covenant Agreement at ¶ 6.2.
[37] **Exhibit A**, Option Agreement at 3 § 7.
[38] **Exhibit B**, Covenant Agreement at ¶ 6.2 (emphasis in original).

amount due.

117. Finally, a homeowner is also required to pay Unison upon a default. In this scenario Unison can foreclose and force a sale of the home.[39] Unison can also implement forced place insurance and make "Protective Advances" for missed insurance or tax payments, which accrue interest at 1.5% per month, from the date of demand until paid in full.[40] Unison can also seek additional liquidated damages if the home is foreclosed upon.[41]

118. If Unison terminates the agreement due to a default, the homeowner is required to pay the Unison Investment Payment (the initial amount advanced), at a minimum, but also may have to pay the amount of the Investor Interest that "exceeds the Unison Investment Payment." [42]Further, the Unison Purchase Price Balance used in the Investor Interest formula is subject to a 10% reduction.[43] As with the other payment conditions, to determine the amount due, the homeowner would have to consult multiple definitions and use multiple formulas. Additionally, in this scenario, the homeowner must also pay attorney's fees and costs incurred by Unison, and the Unison Purchase Price Balance.

[39] **Exhibit B**, Covenant Agreement at ¶ 7.2.
[40] *Id.* at ¶ 8.11(b).
[41] *Id.* at ¶ 7.2(b).
[42] *Id.* at ¶ 7.3(a).
[43] *Id.* at ¶ 7.3(d).

119. Unison's practice of making the total amount due under the Agreement difficult, if not impossible to ascertain is unfair, deceptive, and misleading. It harms consumers by obscuring and/or misleading them as to the true nature and cost of Unison's product, with grave financial consequences. These practices violate Minnesota's mortgage and consumer protection statutes.

### F. Unison's Product is Unfair and Deceptive Because the Homeowner Cannot Understand the Total Costs Due Under the Agreement or How Those Costs Will Impact the Overall Transaction

120. In addition to the final payment due at the conclusion of the Agreement, the homeowner must shoulder various costs and fees throughout the transaction. These fees end up costing the homeowner more than just their total dollar amount. They also increase the amount of money Unison will be entitled to at the conclusion of the Agreement, to the homeowner's detriment.

121. At the outset of the Agreement, Unison typically discounts the Original Agreed Value of the home and requires the homeowner to pay all transaction fees associated with the initiation and origination of the Agreement.

122. Currently, Unison usually applies a 5% discount to the value of the home to arrive at the Original Agreed Value. Unison describes this discount as a "Risk Adjustment" that "helps account for the uncertainty inherent in the

appraisal process. It also allows Unison to deliver your funds faster and without the added costs of multiple appraisals."[44]

123. The discount in the Original Agreed Value adversely impacts the advance to the homeowner at the outset of the transaction and the repayment due to Unison at the end of the transaction.

124. This is because both the Unison Investment Payment (the initial advance to the homeowner) and the Unison Purchase Price Balance (the offset of Unison's profits at the end of the transaction) are keyed off of the Original Agreed Value.

125. For example, Unison advertises that homeowners can access up to 15% of the home's value.[45]

126. By reducing the value of the home by 5% before determining the dollar amount that the homeowner will receive, the homeowner is already receiving a discounted amount of equity at the outset of the Agreement, in return for promising Unison a significant stake in the home's *undiscounted* future value.

---

[44] *How does Unison determine my home's starting value?*, UNISON, https://www.unison.com/faqs/question/esa-starting-value (last visited on Sept. 28, 2026); *How does Unison determine my home's starting value?*, UNISON, https://www.unison.com/equity-sharing-agreement (last visited Sept. 28, 2026).

[45] *How much funding is available?*, UNISON, https://www.unison.com/faqs/question/esa-funding-amount, (last visited on Sept. 28, 2026).

127. This 5% reduction in Original Agreed Value also reduces the total amount of the Unison Purchase Price Balance. Although characterized as a payment due to consumers at the end of the transaction, the Unison Purchase Price Balance in fact serves as an offset to the total amount the homeowner will owe at the end of the Agreement.

128. By reducing the Original Agreed Value from which the Unison Purchase Price Balance is derived, Unison reduces the amount by which it will offset its profits and increases the amount Unison will be entitled to demand from homeowners at the conclusion of the Agreement (likely via a sale of the home).

129. The Unison Investment payment is further reduced by the initiation fees, which include a transaction fee and other costs. Upon information and belief, Unison may profit from at least some of the transaction fees it purports to cover costs such as credit reports, appraisals, recording fees and taxes, and settlement fees.

130. At the conclusion of the Agreement, the homeowner is responsible for all costs associated with selling and closing on the home. Again, these costs can total several thousand dollars.

131. Additionally, the impact of these fees goes beyond their dollar amount. In most scenarios involving the sale of the home, Unison determines the Ending Agreed Value of the home based on the gross proceeds of the sale,

meaning the sale price *before* any costs or fees are paid.

132. This is another mechanism to ensure that Unison has access to the largest dollar amount of "home value" from which it can extract its Investor Interest, while the consumer pays the costs.

133. Notably, the Ending Agreed Value of the home is not discounted. This compounds the effect of the discount to the Original Agreed Value at the outset of the Agreement. By discounting the Original Agreed Value but not the Ending Value, Unison increases the amount of home value to which it claims it is entitled.

134. The reason the final payment and the costs of the transaction are not easy to decipher is, itself, plain. If homeowners knew that the ultimate cost of the transaction could be hundreds of thousands of dollars, would likely require them to sell their home, and/or could result in foreclosure, they would be much less likely to enter into the Agreement. This would not bode well for Unison's profits or its investors. Obscuring the truth is to Unison's benefit and violates Minnesota mortgage and consumer protection laws.

### G. Unison Misrepresents Nearly Every Aspect of its Product and Engages in Other Unfair Practices

135. In addition to obscuring the total cost and final payment amount due under the Agreement, Unison misrepresents nearly every aspect of its product to homeowners.

136. To begin with, Unison markets itself as a "partner" with the homeowner. This representation is made repeatedly throughout Unison's website and marketing materials with statements like "Unison stands with you, here when you need us."[46]

137. Additionally, a marketing video on Unison's website and YouTube also emphasizes the purported partnership aspect of the Agreement. The video explains that Unison is a "partnership, fair and square and yes, it's kind of cool."[47]

138. The video continues: "Again, we're partners … so we split the change in value of your home, even if your home depreciates, we actually take the hit along with you. You heard that right. Either we both profit or we both share in the loss. That's what we mean by a fair partnership. We're truly there with you through the ups and the downs."[48]

139. These statements lead the homeowner to believe that they are, in fact, partners with Unison and that they will share together in the increase or decrease in the home.

140. This gives consumers an inaccurate impression of the relationship

---

[46] *Access your Equity*, UNISON, https://www.unison.com/equity-sharing-agreement, (last visited on Sept. 28, 2026).
[47] Unison, *How it Works – Unison Equity Sharing – Homeowner*, YOUTUBE, at 0:42-45 (June 30, 2023), https://www.youtube.com/watch?v=KG7ygY6_sWM, (last visited on Sept. 28, 2025).
[48] *Id.* at 1:15-34.

and the terms of the Agreement. These statements are misleading for many reasons.

141. First, the Agreement itself explicitly disclaims any partnership relationship with the homeowner, directly contradicting Unison's other representations. "Investor shall not be deemed a partner . . . or fiduciary with, or of, Owner."[49]

142. This makes sense, because one aspect of a partnership is a fiduciary relationship. But Unison could not possibly abide by this duty with homeowners, given its goal to increase returns for its investors.

143. Additionally, Unison is not a partner in even the layman's sense of the word. Unison has built into the Agreement a variety of mechanisms designed to ensure it will maximize the Company's return and minimize risk, even if the home value depreciates, including by manipulating the Original Agreed Value, requiring the homeowner to shoulder all costs, and having significant influence over the Ending Agreed Value.

144. Further, the representation that Unison will share in any depreciation is misleading because in certain circumstances, Unison expressly disclaims a share of any depreciation. For example, if the homeowner exits the Agreement during the first three to five years (depending on when the

[49] **Exhibit B**, Covenant Agreement at ¶ 9.3.

Agreement was executed) Unison does not share in any losses.

145. Unison also makes statements about the homeowner maintaining "control [of] the property and receiving the benefits of home ownership, such as occupancy rights."[50] It markets the product to homeowners as a "simple, fair way to access the wealth that is tied up in your home"[51] so that homeowners can live the life they really want.

146. These statements mislead consumers about the complexity of the Agreement, including the significant restrictions placed on the home under the Agreement. These restrictions include prohibiting renting out the home, retaining the home as a primary residence, limits on the maximum total debt the homeowner can carry during the Agreement, limits on refinancing and other equity products, and granting Unison the right to interfere in a sale if it believes the sale price is too low.

147. Unison's website mentions some of these restrictions in the Frequently Asked Question section. However, these statements fail to ensure that the homeowner has an accurate understanding of the realities of the product when considered alongside Unison's competing statements about the

---

[50] *Do I still own my home with an Equity Sharing Agreement?*, UNISON, https://www.unison.com/faqs/question/esa-home-ownership, (last visited on Sept. 28, 2026).

[51] Unison, *How it Works – Unison Equity Sharing – Homeowner*, YOUTUBE, at 0:17-19 (June 30, 2023), https://www.youtube.com/watch?v=KG7ygY6 sWM, (last visited on Sept. 28, 2026).

ease and simplicity of the Agreement that are featured prominently on Unison's website.

148. Further, on information and belief, no Unison representative is present at closing. Only a notary attends, and the homeowner is unable to ask a Unison representative questions about Unison's conflicting statements or the intricacies of the Agreement.

149. Unison also makes misleading representations about the amount homeowners will have to pay at the conclusion of the Agreement. These statements appear in various places throughout the website and give the homeowner the impression the payment will not be significant or impact any equity amassed through their monthly mortgage payments.

150. In the Conditional Approval Package, Unison represents that there are scenarios in which a homeowner may owe nothing to Unison at the end of the Agreement. This is also misleading. As discussed above, under nearly all circumstances the homeowner will owe Unison amounts that exceed the initial amounts advanced. And Unison has built several mechanisms into the Agreement to ensure that it reaps a return on the Agreement. Highlighting a remote scenario in which a homeowner may owe $0 at the conclusion of the Agreement despite Unison's one-sided agreement misleads consumers about the total costs and risks associated with Unison's product.

151. These examples, alongside Unison's other statements serve to

mislead homeowners about the amount they will be required to pay Unison at the conclusion of the Agreement.

152. Unison repeatedly emphasizes that its product does not create debt.

153. This is misleading. Debt is a future payment obligation. As discussed throughout, the homeowner will have payment obligations to Unison at the end of the Agreement.

154. Unison's statements that there is no interest associated with the Agreement are also misleading and false. Interest is merely the amount owed in return for the use of borrowed money. As discussed, homeowners will, in the vast majority of circumstances, be required to pay Unison more than they were advanced. Indeed, this is key to Unison's success. If Unison did not recover interest on the money it provided homeowners, it would not reap any profits, much less the 20% returns it touts to investors. Additionally, if Unison makes protective advances on behalf of a homeowner, those explicitly accrue interest at 1.5% per month.

155. Unison's statements that its product is not a loan are misleading for the reasons discussed in Sections C and E and designed to lure homeowners into its product, rather than other, potentially more suitable, equity products.

156. Unison also emphasizes throughout its website and promotional videos that there are no monthly payments. This is misleading because the

homeowner must continue to make monthly payments under the Agreement, such as property taxes, insurance, and mortgage payments, if applicable. Failure to make such payments can result in a triggering event and enable Unison to exercise its "option".

157. Finally, Unison engages in unfair practices related to appraisals. In many circumstances, the Ending Agreed Value used to determine Unison's Investor Proceeds relies on an appraised value of the home. As a result, Unison has an interest in a high appraisal value at the conclusion of the Agreement. Unison's interest is exemplified by the provision in the Agreement that permits Unison to order an additional appraisal if it determines that a proposed sale price is too low. By invoking this provision, Unison can obtain a higher appraisal that will result in the company's investors recouping a larger amount of the homeowners' equity.

158. The impact of Unison's repeated and prolific misrepresentations is that homeowners have no real understanding of the Agreement they are entering into. They believe the Agreement is simple and easy, allows them to access their home equity with no interest or monthly payment obligations. In reality, while homeowners may get an immediate influx of cash at the start of the Agreement, they risk losing their largest asset. That reality is not made clear to the homeowner at the outset of the Agreement and, by the time they discover it, it is often too late to save their home or the equity in their home

that they have built up over many years.

**PLAINTIFFS' EXPERIENCE**

159. In 2018, the Allens were looking to finance a new home build in Roseville, Minnesota. They needed down payment assistance because they had not yet sold their existing home. Their first mortgage lender, Guaranteed Lending Corporation, introduced them to Unison.

160. They had no reason to believe at that time that anything was amiss.

161. On or around July 3, 2018, the Allens received a Unison Offer letter.

162. The Allens received the Unison Conditional Approval Package at the end of November 2018.

163. The Conditional Approval Package did not contain copies of the four core documents that make up the Agreement. The Conditional Approval Package also did not contain an amount, estimate or otherwise, that the Allens would be responsible for repaying to Unison.

164. Unison determined that the Allens' "Original Agreed Value" on the new home was $510,000. Therefore, Unison offered a $51,000 "Unison Down Payment" or 10% of the "Original Agreed Value". The Investor Percentage for the Allens' Agreement is 35%.

165. The Allens signed the HomeBuyer Agreement on January 9, 2019.

166. After the transaction fee and closing costs, Unison only advanced $49,313.60 to the Allens.

167. In the spring of 2026, the Allens wanted to take out a HELOC from a different local bank to consolidate some consumer debt. The banker who reviewed the existing mortgage and security interests on their home was really confused by the Unison mortgage interest and the nature of Unison's Agreement. The Allens were limited in what they could access in their home equity due to Unison's interest in the home and the amount remaining on their first mortgage. The banker advised the Allens to attempt to get out of the Unison Agreement as soon as they could. This was the first time that the Allens learned that the Unison Agreement was not as Unison represented.

**CLASS ACTION ALLEGATIONS**

168. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following proposed class:

a. All individuals who entered into a Unison Agreement or similar Unison product for a property located in Minnesota.

169. The requirements for class certification under Rule 23 of the Federal Rules of Civil Procedure are met as follows:

a. **Numerosity.** Plaintiffs are informed and believe, and on that basis alleges, that there are hundreds of person in the State of Minnesota who have entered into Unison

Agreements with Unison. As such, the members of the class are so numerous that joinder of all members in one proceeding would be impracticable.

b. **Commonality**. There are common questions of law and fact common to the Class, including without limitation:

i. Whether Unison's Agreements are mortgage loans;

ii. Whether Unison's Agreements are subject to state consumer lending laws;

iii. Whether Unison's Agreements violate state consumer protection laws;

iv. Whether Unison violated the Minnesota Reverse Mortgage Act and the Minnesota Residential Mortgage Loan Act;

v. Whether Unison engaged in deceptive or unfair trade practices in violation of the Minnesota Consumer Fraud Act or Deceptive Trade Practices Act;

vi. Whether Unison acted willfully, intentionally, and/or recklessly in violating federal or state consumer lending laws;

vii. Whether all consumers subject to Unison's Agreements are entitled to declaratory judgment;

viii. Whether all consumers subject to Unison's Agreements are entitled to reformation or rescission of their agreements, as well as statutory, actual, and punitive damages;

ix. Whether the members of the Class are entitled to equitable relief, including injunctive and equitable monetary relief.

c. **Typicality.** The claims of Plaintiffs are typical of the claims of members of the Class, as the proposed Class consists of members who have entered into Unison's Agreements.

d. **Adequacy of representation.** The Plaintiffs will fairly and adequately represent the members of the Class and have retained counsel who are competent an experienced in class action and complex litigation.

170. The damages sought by each Class member are such that individual prosecution would prove burdensome and excessively expensive given the complex and extensive litigation necessitated by Unison's conduct.

171. It would be virtually impossible for the members of the Class to individually redress the wrongs done to them, and it would be an unnecessary burden to the Courts.

172. Additionally, individualized litigation presents a potential for

inconsistent and contradictory judgments and increases delay and expense to all parties and to the court system presented by the complex legal and factual raised by Unison's conduct.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF MINNESOTA RESIDENTIAL MORTGAGE ORIGINATOR AND SERVICER LICENSING ACT ("MOSLA") MINN. STAT. § 58.13-58.18

173. Plaintiffs fully incorporate by reference the preceding paragraphs as though fully set forth herein.

174. The Minnesota Residential Mortgage Originator and Servicer Licensing Act was first enacted in 1998 "to regulate the residential mortgage origination and servicing industry." *Pomrenke v. Comm'r of Commerce*, 677 N.W.2d 85, 90 (Minn. Ct. App. 2004). It requires that mortgage originators be subject to supervision in their conduct by a state agency, the Minnesota Department of Commerce, and that they abide by safety and soundness requirements and avoid engaging in deceptive, abusive, and predatory acts as specified in the statute.

175. The Residential Mortgage Originator and Servicer Licensing Act provides a "borrower injured by a violation of the standards, duties, prohibitions, or requirements of sections 58.13, 58.136, 58.137, 58.16, and 58.161" with a private right of action.

176. A residential mortgage loan is "a loan secured primarily by… a mortgage, deed of trust, or other equivalent security interest on residential real estate…" Minn. Stat. § 58.02.

177. Subdivision 1 of section 58.04 provides that "[n]o person shall act as a residential mortgage originator, or make residential mortgage loans without first obtaining a license[.]" A person violates the statute's licensing requirement if they either "act as a residential mortgage originator" or "make residential mortgage loans" without a license.

178. Subdivision 3 of section 58.04 further states that "[n]o person required to be licensed under this chapter may, without a license, do business under a name or title or circulate or use advertising or make representations or give information to a person, that indicates or reasonably implies activity within the scope of this chapter."

179. One alternative basis for application of the statute and licensing requirements—"making [of] residential mortgage loan[s]"—is defined in subdivision 12 of section 58.02. It states, "[m]aking a residential mortgage loan means for compensation or gain, or the expectation of ompensation or gain, to advance funds or make a commitment to advance funds in connection with a residential mortgage."

180. The other alternative basis for application of the statute and licensing requirements—acting as a "residential mortgage originator"—is defined by subdivision 19 of section 58.02. It provides that a "[r]esidential mortgage originator means a person who, directly or indirectly, for compensation or gain or in expectation of compensation or gain, solicits or offers to solicit, or accepts or offers to accept an application for a residential mortgage loan through any medium or mode of communication from a borrower, or makes a residential mortgage loan." Subdivision 18 of section 58.02 further provides that "[r]esidential mortgage loan" is "a loan secured primarily by…a mortgage, deed of trust, or other equivalent security interest on residential real estate."

181. The Unison Defendants have met or meet both alternative bases for application of the statute and licensing requirements under chapter 58. First, they advance funds or make a commitment to advance funds to Minnesota consumers and do so for compensation or gain or in expectation of compensation or gain. Thus, they have made residential mortgage loans under subdivision 12 of section 58.02 and are subject to licensing supervision by the Minnesota Commissioner of Commerce pursuant to that law. Second, they, either "directly or indirectly," have "solicit[ed] or offer[ed] to solicit, or accept[ed] or offer[ed] to accept an application for a residential mortgage loan through any medium or mode of communication from a

borrower" under subdivision 19 of section 58.02 and done so "for compensation or gain or in expectation of compensation or gain." Thus, they are subject to supervision and regulations under that law. The mortgage loans made by Defendants in Minnesota are secured by their interest in the homeowners' residential real estate and thus are residential mortgage loans within the meaning of Minn. Stat. § 58.02, subd. 18.

182. On information and belief, none of the Unison Defendants are or have been licensed by the Department of Commercse under chapter 58.

183. Section 58.13 provides the Standards of Conduct for those acting as residential mortgage originators or servicers. These guidelines prohibit originators and services from "[m]aking or causing to be made, directly or indirectly, any false, deceptive, or misleading statement or representation in connection with a residential loan transaction including, without limitation, a false, deceptive, or misleading statement or representation regarding the borrower's ability to qualify for any mortgage product."

184. In addition, residential mortgage originators or servicers may not "make, provide, or arrange for a residential mortgage loan without verifying the borrower's reasonable ability to pay the scheduled payments of the following, as applicable: principal; interest; real estate taxes; homeowner's insurance, assessments, and mortgage insurance premiums."

185. As stated in above, Unison has engaged in this prohibited conduct engaging in false, fraudulent, and/or misleading statements regarding Unison's home equity products. Unison deliberately misleads homeowners regarding the amounts homeowners will owe Unison and whether they will be able to pay Unison without losing their home.

186. Residential mortgage lenders may not exceed the applicable limits on the rate and amount of interest, discount points, finance charges, fees, and other charges for any consumer loan.

187. Unison has engaged in this prohibited conduct because it is not a licensed lender and even if it were, it is not permitted to charge interest of more than four percentage points above the applicable average prime offer rate.

188. Residential mortgage lenders may not include in the principal amount of any residential mortgage loan all or any portion of any lender fee in an aggregate amount exceeding five percent of the loan amount. Minn. Stat. § 58.137.

189. As stated above, Unison has engaged in this prohibited conduct.

190. Plaintiffs and members of the Class may enforce the provisions of the Minnesota Residential Mortgage Originator and Servicer licensing act under Minnesota's Private Attorney General Statute, Minn. Stat. § 8.31, subd. 3a, and § 58.18.

191. Plaintiffs and the Class are entitled to disgorgement, restitution or actual damages, costs, civil penalties, and reasonable attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a and § 58.18.

**COUNT II**
**VIOLATION OF MINNESOTA REVERSE MORTGAGE ACT ("MRMA")**
**MINN. STAT. § 47.58**

192. Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

193. Unison's Agreement functions as a reverse mortgage under Minnesota law because it involves a "committed principal amount" paid to the borrower over a specified term that is secured by a mortgage. *See* Minn. Stat § 47.58(1)(2).

194. Minnesota's Reverse Mortgage Statute provides guidelines that lenders must follow in order to be valid, including, but not limited to:

a. Restrictions on lender eligibility, limiting lenders to banks, credit unions, savings banks, savings associations, residential mortgage originators, and insurance companies;

b. Mandatory communication with a third-party designee; and

c. Interest rate limitations and limitations on share of future appreciation.

195. Unison is not an eligible lender under the statute.

196. Unison does not provide or require any independent counseling to homeowners prior to signing to ensure they understand the contract they are entering.

197. In addition, the Reverse Mortgage Loan statute sets the maximum allowable interest rate that may be charged for a reverse mortgage, which is the average prime offer rate, plus four percentage points. Minn. Stat. § 47.58.

198. Unison's Agreements exceed the rate cap.

199. Unison further violated the provisions of MRMA by advertising its product as an "investment" and not a loan, lending money to Plaintiffs and Class members who are under the age of 60.

200. As stated above, Unison has engaged in conduct prohibited by the MRMA.

201. Plaintiffs and members of the Class may enforce the provisions of the Minnesota Reverse Mortgage Statute under Minnesota's Private Attorney General Statute, Minn. Stat. § 8.31, subd. 3a and § 58.18.

202. Plaintiffs and the Class are entitled to disgorgement, restitution or actual damages, costs, civil penalties, and reasonable attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a, § 47.58, and § 58.18.

**COUNT III**
**MINNESOTA REGULATED LOAN ACT ("MRLA")**
**MINN. STAT. CH. 56**

203. Plaintiffs incorporate by reference each and every paragraph

above as though fully set forth herein.

204. The Minnesota Regulated Loan Act requires persons to be licensed by the Department of Commerce if they are engaged "in the business of making loans of money [or] credit" in amounts less than $100,000 and "charge, contract for, or receive on the loan a greater rate of interest, discount, or consideration than the lender would be permitted by law to charge if not a licensee under this chapter [58]." Minn. Stat. §§ 56.01, 56.131. The ordinary "rate of interest, discount, or consideration" that is permitted for non-licensees is generally found in Minn. Stat. ch. 334 (Minnesota's general usury law), which caps the amount that a lender can receive on closed-end credit at an annual rate of 8%. Thus, generally, a lender that wishes to "charge, contract for, or receive" a return on a loan in any manner that exceeds an annual rate of 8% must obtain a license under chapter 56 and be supervised as a regulated lender by the Minnesota Department of Commerce.8

205. Chapter 56 defines "person" to include corporations. Minn. Stat. § 56.001, subd. 8.

206. Defendants are thus persons within the meaning of the statute.

207. The agreements offered by Defendants are subject to chapter 56. Defendants advance sums less than $100,000 to Minnesota homeowners for temporary use and in exchange for expected compensation. The fees and returns charged for or collected by Defendants in excess of the advance they

make to consumers is interest.

208. None of the Unison Defendants had a chapter 56 license when operating in Minnesota and when they charged, contracted for, or received payments that exceed chapter 334's general annualized interest rate cap of 8%. Unison Defendants' maximum interest rate (i.e., their "Annualized Cost Limit") on such loans exceeds 8% and does not always account for origination fees that should be included in the calculation of that rate.

209. Defendants' conduct, practices, and actions described in this Complaint constitute multiple separate violations of chapter 56.

**COUNT IV**
**VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT ("CFA")**
**MINN. STAT. §§ 325F.68–.70**

210. Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

211. Plaintiffs and the Unison Defendants are "persons" under the definition of Minn. Stat. § 325F.68, subd. 3.

212. Unison's violations of MOSLA, MMRA, and MRLA constitute per se violations of the CFA,

213. As stated above, Unison has engaged in other prohibited conduct. Unison further engaged in unfair, misleading and deceptive practices, omissions, and misrepresentations by conducting a predatory scheme to induce

consumers into entering the high-risk home equity investment contracts.

214. Unison engaged in unfair, unconscionable, abusive, or deceptive practices, including but not limited to, and as described above: claiming that the “option” agreement is not a right that Unison intends to exercise; falsely claiming that the product is not a loan, when it is a loan; failing to adequately or properly disclose the true cost of the transaction; assessing improper and excessive fees, finance charges, and costs; marketing the loan as being able to be paid off in multiple forms, when Unison knows that the loan will most likely have to be paid through sale of the home, the terms of which Unison attempts to dictate; falsely claiming that the homeowner has no monthly obligations when the contract imposes monthly obligations on the homeowner; representing or implying by its conduct that it was authorized to engage in their transaction; falsely claiming that it provides freedom to the homeowner while obscuring the fact that it restricts the homeowner’s freedom to engage with their home as they wish; failing to underwrite the loan for ability to repay it without loss of the home; purporting to restrict the homeowner’s rights; drafting the contract in an intentionally confusing manner that makes it impossible to understand; and failing to comply with applicable statutes and regulations.

215. Unison intends that consumers will rely on its misleading omissions and misstatements at the time consumers sign an Option Purchase

Agreement. Consumers actually relied on Unison's misleading omissions and misstatements.

216. Unison further engaged in unfair acts or practices by drafting an unconscionable contract.

217. Plaintiffs reasonably believed that Unison's contracts would provide them with an equitable option for obtaining financing. Plaintiffs would not have entered into the contracts with Unison if they had known that Unison was engaging in unauthorized practices, as detailed above.

218. Plaintiffs have been damaged by Unison's additional unfair and unconscionable use of anticompetitive valuation models that restrict Plaintiffs' ability to sell their homes.

219. Plaintiff was damaged by Unison's deceptive or misleading statements and omissions and unfair practices. Plaintiff suffered an ascertainable loss of money or property as the result of Unison's conduct, including but not limited to fees, improper encumbrance of title, and diminution of value of Plaintiffs' interest in the property.

220. Minnesota law expressly permits private citizens to enforce the laws "respecting unfair, discriminatory, and other unlawful practices" through Minn. Stat. § 8.31, subd. 3a, and award to the Plaintiffs their equitable or other damages, costs, and disbursements, including the costs of investigation and

reasonable attorneys' fees, together with any other equitable relief to be determined by this Court.

221. This lawsuit benefits the public at large because Unison has engaged in a systematic violation of Minnesota state laws specifically enacted to protect consumers from predatory loan schemes. This action benefits the Minnesota general public because it seeks to remedy Unison's unfair, confusing, and deceptive practices and conduct with respect to its HEI contracts.

222. Plaintiffs and the Class are entitled to disgorgement, restitution or actual damages, costs, and reasonable attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

223. Plaintiffs also are entitled to recover injunctive relief or other equitable relief, including but not limited to reformation of the contracts.

**COUNT V**
**VIOLATION OF DECEPTIVE TRADE PRACTICES ACT ("DTPA"), MINN. STAT. §§ 325D.43, ET SEQ.**

224. Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

225. Unison engages in unfair, deceptive, confusing, or unconscionable acts or practices when it misrepresents the true nature of its product, including that:

a. Its product is not a loan;

b. Its product is an "option";

c. It does not charge interest; and

d. There are no payments or monthly payments required for ten years.

226. In addition, Unison engages in unfair, deceptive, confusing, or unconscionable acts or practices when it restricts homeowners' ability to sell their homes and employs unfair and potentially anticompetitive valuation models.

227. Unison's conduct, representations, and contracts create a likelihood of confusion or misunderstanding because its contracts and products do not comply with applicable laws and regulations.

228. Unison has repeatedly violated DTPA, by engaging in the unfair and unconscionable conduct described in this Complaint.

229. Plaintiffs and members of the Class are thus entitled to declaratory or injunctive relief, including reformation of the contracts because based on Unison's conduct to date, it is unlikely that Unison will follow the laws applicable to the business of residential real estate mortgage lending laws.

230. Plaintiffs and the Class seek an order declaring and enjoining Unison's unfair and deceptive acts or practices in violation of the DTPA and awarding their costs and attorneys' fees.

## COUNT VI
## DECLARATORY JUDGMENT

231. Plaintiffs incorporate by reference each and every paragraph above as though fully set forth herein.

232. Federal courts "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

233. An actual controversy exists between Plaintiffs and Unison concerning the legality of Unison's Option Purchase Agreements and the rights and obligations of the parties thereunder.

234. Plaintiffs seek a declaratory judgment declaring that:

a. Unison's Agreements constitute mortgage loans in Minnesota;

b. Unison's Agreements are subject to Minnesota consumer lending statutes;

c. All fee-shifting provisions in Unison's Agreements, allowing Unison to be awarded attorneys' fees from Plaintiffs in action are unenforceable. In Minnesota, no party may recover attorneys' fees except as expressly authorized by statute.

235. A declaratory judgment is necessary and appropriate to determine the respective rights and obligations of the parties and to provide guidance for future conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully request relief from this Court as follows:

1. Certification of this case as a class action under Rule 23 on behalf of the proposed class and designation of Plaintiffs as class representatives and their counsel as class counsel;

2. Declaratory or injunctive relief in favor of Plaintiffs and the members of the class against Unison, finding Unison's practices as described herein violate the MOSLA, MRMA, MRLA, DTPA, CFA, and common laws;

3. Find that Unison's actions, as set forth above, constitute multiple violations of law alleged;

4. For the relief authorized by the violations of law alleged;

5. An Order awarding equitable disgorgement or restitution, or other damages, including but not limited to any statutory, actual, punitive and treble damages, in an amount to be determined by the Court or jury;

6. Pre-award or prejudgment interest;

7. An award of attorneys' fees, costs, and disbursements; and

8. All other relief as the Court finds just and equitable.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand trial by jury to all issues in the above matter.

Date: October 2, 2026

Respectfully submitted,

**HELLMUTH & JOHNSON, PLLC**

By: */s/ Anne T. Regan*
Anne T. Regan (MN #0333852)
Neven Selimovic (MN #0400240)
Catherine N. Posch-Johnson (MN #040276)
Sarah G. Loken (MN #0506589)
8050 West 78th Street
Edina, MN 55439
(952) 941-4005
aregan@hjlawfirm.com
nselimovic@hjlawfirm.com
cposchjohnson@hjlawfirm.com
sloken@hjlawfirm.com

Scott C. Harris
**BRYSON HARRIS SUCIU DEMAY, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
(919) 600-5003
sharris@brysonpllc.com

**ATTORNEYS FOR PLAINTIFFS**